```
 1                      UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3   ROBERT L. JOHNSON, SR.,    )    Docket No. 07-CV-781-MJR
     ANTHONY L. RICHARDSON,     )
 4   SHEILA M. SYDNOR, and      )    Benton, Illinois
     DEBORAH A. SPARKS,         )    February 4, 2010
 5   individually, and on       )
     behalf of all others       )
 6   similarly situated,        )
                                )
 7           Plaintiffs,        )
                                )
 8   vs.                        )
                                )
 9   ALLSTATE INSURANCE         )
     COMPANY,                   )
10                              )
             Defendant.         )
11

12                    TELEPHONE MOTION HEARING
              BEFORE THE HONORABLE PHILIP M. FRAZIER
13         UNITED STATES DISTRICT COURT MAGISTRATE-JUDGE

14

15   APPEARANCES:

16   For the Plaintiff:    Mr. Ronald Martin Weber, Jr.
                           Crowley, Norman, LLP
17                         Three Riverway, Suite 1775
                           Houston, TX 77056
18                         713-651-1771
                           Email: mweber@crowleynorman.com
19
                           Mr. Aaron M. Zigler
20                         Korein, Tillery - St. Louis
                           505 N. 7th Street, Suite 3600
21                         St. Louis, MO 63101
                           314-241-3525
22                         Email: azigler@koreintillery.com

23                         Mr. Walt Roper
                           Law Offices of Walt D. Roper, PC
24                         3100 Monticello Avenue, Suite 500
                           Dallas, TX 75205
25                         972-755-2525
                           Email: walt@roperfirm.com
```

```
 1
    For the Defendant:    Mr. M. Keith Moskowitz
 2                        Ms. Anne W. Mitchell
                          Sonnenschein, Nath, et al. - Chicago
 3                        7800 Sears Tower
                          233 South Wacker Drive
 4                        Chicago, IL  60606
                          312-876-8000
 5                        Email: mmoskowitz@sonnenschein.com

 6  Court Reporter:       Jane McCorkle
                          301 W. Main Street
 7                        Benton, Illinois 62812
                          618-439-7725
 8                        janemccorkle@verizon.net

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            THE COURT:  Hello.  This is Judge Frazier.

2            MR. ZIGLER:  Hi, Judge.  Aaron Zigler for the

3  plaintiffs.

4            MR. MOSKOWITZ:  Keith Moskowitz for Allstate,

5  Judge.

6            THE COURT:  All right.

7            MR. ROPER:  Walt Roper for the plaintiffs.

8            THE COURT:  I am going to do this for the court

9  reporter.  Anybody else who wants their name on the record so

10 they can submit a bill?

11           MR. WEBER:  Marty Weber.

12           THE COURT:  Here we go.  Who's Marty?  Marty's also

13 for the plaintiffs?

14           MR. WEBER:  Yes.

15           MR. MOSKOWITZ:  I believe Ann Mitchell is on the

16 line, as well, for the defendant.  Ann, are you on?

17           MS. MITCHELL:  Yes, I'm here.

18           MR. MOSKOWITZ:  Thank you.

19           THE COURT:  All right.  Moving a little slow today,

20 guys.  I'm on the tail end of whatever crud's been going

21 around so bear with me.

22           We've got a couple of things here.  We've got the

23 attorney-client privilege question on several documents that

24 have been withheld and that's been briefed.  And then we've

25 got the motion for partial reconsideration regarding the

1    documents provided to the FTC.

2             So which one do we want to start with?

3             MR. ZIGLER:  I don't have any preference.

4             THE COURT:  If you guys could maybe announce

5    yourselves when you talk on the record so our court reporter

6    can get it down accurately.

7             MR. ZIGLER:  Sure.  I'm sorry.  Aaron Zigler.

8             MR. BOZARTH:  Judge, Troy Bozarth for the

9    defendant.  We have no preference either.

10            THE COURT:  Who's going to speak for the defendants

11   here, primarily?  Keith, you've been talking primarily for

12   them.  Is Troy going to do the talking for them today?

13            MR. MOSKOWITZ:  Correct.  This is Keith Moskowitz,

14   Your Honor.  I'm on the front end of the crud.  If you can't

15   hear me, because I'm losing my voice, let me know and I'll

16   speak up.

17       (Off the record discussion.)

18            THE COURT:  Let's go on the attorney-client

19   privilege thing.  All right?  And I got to say here, my law

20   clerk and I were sitting around talking about this earlier,

21   and I guess this is like many things.  It depends on how you

22   look at it as to who is advising a top level corporate

23   person.  I mean I guess you could say that in some degree,

24   every person who holds jobs that are not purely ministerial

25   or administrative, something like that, all of those people

1  are providing some form of or could give some advice or

2  counsel that's going to work its way up into the top offices.

3          On the other hand, you know, then if you look at it

4  from the other direction, you've got the president of

5  Allstate who is Mr. -- who is that?  Reubenson.

6          MR. MOSKOWITZ:  Hal Wilson, Your Honor.

7          THE COURT:  Who is it now?

8          MR. MOSKOWITZ:  Hal Wilson, Your Honor.

9          THE COURT:  Wilson.  Okay.  We're showing some

10  references to George Reubenson as president of Allstate.  Has

11  he been --

12          MR. MOSKOWITZ:  You know something, that was a

13  recent change.  I believe Mr. Wilson was the president, and

14  now maybe Mr. Reubenson has ascended.  Frankly, Your Honor,

15  I'm forgetting the exact order.  Tom Wilson is on the top of

16  the pyramid.

17          THE COURT:  Tom Wilson is on the top of the

18  pyramid?

19          MR. MOSKOWITZ:  Correct, Your Honor.

20          THE COURT:  What I'm looking at here, here's this

21  little Erin English, who is a products operation consultant.

22  She was also your 30(b)(6) designee for certain topics, but

23  then the question is is she a member of top management or is

24  she someone on which top management relies, because she

25  reports to one, two, three, four, five people, the fifth

1   person being Darryl Fletcher.

2          Now Darryl Fletcher reports to Fred Cripe, senior

3   vice president of product operations, and he obviously is top

4   management.  So we could say that certainly Darryl Fletcher

5   is somebody who reports to top management or somebody on whom

6   top management would rely, but then we start getting pretty

7   diluted, you know.

8          Then you go down to Frank Palmer, and Frank's stuff

9   has to go through Darryl on its way to Fred before it gets to

10  the top.  And then on below him is Eric Huls and below him is

11  Carolyn Parker, et cetera.

12          You know, it's starting to look kind of hard to

13  conclude that Erin English, although it is conceivable, that

14  some of her work product could find its way to the top

15  levels.  It's hard to conclude that she is someone on whom

16  they regularly rely or on whom they regularly consult.

17  Either that or your diagram of the hierarchy there needs to

18  be reworked.  I don't know.  What do you think about that?

19          MR. MOSKOWITZ:  Your Honor, Keith Moskowitz, again,

20  for the record.  I can sure respond to that, but first you

21  have the general flow chart that reflects the distribution of

22  employees in the corporate chain of command.

23          With respect to Erin English, I think it's

24  important to look beyond that flow chart and to look at the

25  documents that are at issue.  Now the Court had asked the

1   plaintiff to identify specific documents in which English was

2   a recipient or she could use the documents for purposes of

3   making an evaluation, because I think the Court correctly

4   recognized that there are no rules here, and you have to look

5   at the factual circumstances surrounding each.  They didn't

6   do that.

7           But one of the things we note from looking at the

8   laws and looking at a number of the documents that

9   Ms. English is on is that they relate to her role on a team

10   that was set up to respond to customer complaints related to

11   credit scoring.  And I will take, when you put into context

12   that team, you get beyond simply looking at a flow chart, an

13   organizational flow chart, and you get involved in a very

14   specific business application in which the company was

15   receiving complaints from customers, some of which involved

16   insurance regulators regarding Allstate's use of credit

17   scoring on its customers' insurance policies.

18           And the company had, at the time this team was set

19   up, ample experience in dealing with both litigation and

20   regulatory exposure resulting from a fuse or related to a

21   fuse of credit scores.  For example, Ms. English got on the

22   credit score team, I believe, in 2003.  Some of the

23   plaintiffs' lawyers on this call had sued Allstate on credit

24   score issues, and I believe -- correct me if I've got the

25   date wrong -- but I believe it dates back to as early as

1  1999.

2          And independent of the lawyers on this call who

3  have been suing companies in credit cases, there were a

4  multiplicity of other cases that were documented on the

5  record in front of Your Honor in previous proceedings in

6  which the companies had sued.  And, of course, they are

7  getting sued here by customers.  We've got this suit by

8  customers, and all these other cases are brought by customers

9  that are brought on behalf of punitive classes on a state and

10  national basis.

11          And so putting it in context, the company needed to

12  set up the mechanism to handle customer complaints and

13  particularly the credit scoring complaints, and it evolved to

14  both the degree of sophistication in handling the complaints.

15  And that's one of the reasons why you had that special team

16  set up.  Otherwise, all you get are complaints that the Court

17  would likely envision in a variety of business activities,

18  and those are fielded on people who have responsibility for

19  the company.

20          These credit score complaints are more

21  sophisticated and dedicated, too.  And given the litigation,

22  given the regulatory exposure, given the fact that customers

23  are suing the company complaining to regulators, causing

24  regulatory actions to be initiated, there was a lawyer, one

25  of the lawyers assigned to this small team to give legal

1   advice in connection with these complaints because I think,

2   when you, just by evidence of all of the litigation you've

3   had, these things can arise and turn into lawsuits.

4           And so -- excuse me.

5           MR. ZIGLER:  I'm sorry, Keith.  But is there

6   anything in the submission that relates to there was an

7   attorney that was on this team?  Because I haven't seen

8   anything to that regard.  I'm sorry.  I'm just trying to

9   catch up.  For the court reporter, Aaron Zigler.

10          MR. MOSKOWITZ:  Well, Your Honor, I think if we go

11  to the log, there are documents in there where there are

12  lawyers copied on communications.  Even in our submission we

13  point out communication that was brought up in a deposition.

14  I believe it was Ms. English's deposition.  I believe in

15  Ms. English's deposition, one of these types of

16  communications, a copy to the lawyer, I would like for the

17  lawyer to send me that deposition.  I noted it -- I note that

18  it had been inadvertently produced because it identified a

19  lawyer on it and we withdrew it.

20          So the answer to Mr. Zigler's question is, again, I

21  haven't gone through every one of these communications, but

22  there's testimony in the record that we submitted to the

23  Court from Ms. English's deposition, as well as our

24  reference, for example, to a document that we asked to call

25  back during the deposition where there was a lawyer involved

1    in those communications.  So it would be established in the

2    record that there was legal advice that was being handed out

3    with this team that was looking at these complaints.

4            MR. ZIGLER:  To answer to your question, Your

5    Honor --

6            MR. MOSKOWITZ:  Your Honor, may I finish, please?

7            THE COURT:  Aaron, hang on till I tell you to go.

8    All right?

9            MR. ZIGLER:  Sure.  Sorry.

10           MR. MOSKOWITZ:  Over the telephone it's hard.

11           THE COURT:  Sure.

12           MR. MOSKOWITZ:  So just to wrap up, Your Honor, I

13   know Mr. Zigler has some questions or comments, and I'll be

14   happy to field any of them.  If you take in context what

15   Ms. English was doing as part of this dedicated credit team,

16   the analysis under the control groups having some support, in

17   that instance are a very focused, directed company decision.

18   To have a small group of employees handle these sensitive

19   credit scoring cases that were leading to litigation,

20   regulatory, legal compliance issues, consult with lawyers in

21   the process and go ahead and handle those complaints.  I

22   think if viewed in that context, we've made a showing here

23   that we come within the control booth desk.

24           THE COURT:  Let me ask a question before you start,

25   Aaron.

1          MR. MOSKOWITZ:  Okay.

2          THE COURT:  Hang on just a second.  To whom did

3    this group that Erin English was assigned, to whom did that

4    group report or was there any official chain of command or

5    reporting schedule on that?

6          MR. ZIGLER:  I don't know that there was a specific

7    reporting schedule, but it may have changed over time.  The

8    individuals on the business side were in the products

9    operation department, so they would go up to Linda Current

10   (phonetic) that was -- of course, this may have changed over

11   the years, Your Honor, because people change positions.  But

12   you would be looking at people going up the product

13   operations chain of command up to Mr. Cripe.

14          I can't tell you that in each instance there was

15   reporting on a specific customer complaint up that chain, and

16   a lot of these things you get legal advice that you can hand

17   down to the level of the credit team.  On the legal side

18   there's an in-house lawyer involved.  I think his name is

19   mentioned in the deposition testimony we attached.  And, of

20   course, there's a reporting chain within the legal

21   department.

22          Again, I can't say that every single one of these

23   communications resulted in an ultimate reporting up the

24   chain.  Frankly, Your Honor, I would need to look into that.

25          THE COURT:  Well, I guess what I'm curious about,

1   it seems like this is a specially created unit for a special

2   purpose, right?

3           MR. MOSKOWITZ:  Correct, Your Honor.

4           THE COURT:  And so I would be very interested to

5   know who received their reports as they went along.  I mean

6   were there a number of people, any number of people

7   designated that would be privy to everything this committee

8   did?

9           MR. ZIGLER:  Your Honor --

10          THE COURT:  Yes, Aaron.

11          MR. ZIGLER:  -- I can address some of these points

12  now.

13          THE COURT:  Yes.

14          MR. ZIGLER:  Thank you.  First of all, I wanted to

15  note a couple of things.  Your Honor was reading from a brief

16  when you noted that Ms. English was seven reporting down from

17  George Reubenson, but what I wanted to note there is that

18  what's important is the actual standard out of *Consolidation*

19  *Coal*, which is not only those opinions who are someone upon

20  top management rely, but it's a little bit more strict than

21  that.  It's those who directly advised the decision makers

22  and whose opinions were relied by top management, and that's

23  *Consolidation Coal*, which we cited to the Court.

24          THE COURT:  Hang on a second, Aaron.  Aaron, let me

25  interrupt you.  I guess that's why I was just asking Keith,

1   and I understand what you're saying, but I'm just wondering

2   is it possible that perhaps some little like ad hoc committee

3   or somebody who's set up for a special purpose, that they

4   might report outside the regular flow chart there.  That they

5   might --

6           MR. ZIGLER:  Well, and I understand that, Your

7   Honor, which is what my second point was.  There have been

8   several things that have been said here today which I would

9   submit are not in the record that's before the Court, and

10  just let me point those out.

11          That there was a lawyer on this team.  There's been

12  no evidence of that.  That there was, that there is some

13  intention by Allstate to create a small group of employees to

14  handle a specific thing.  Nothing in the record to establish

15  that.  Or that this was a specially created unit.  There is

16  nothing in the record to establish that.

17          What plaintiffs have offered, in addition to a list

18  of every document upon which Erin English was either an

19  author or recipient has been designated as privileged under

20  the attorney-client privilege, which was Exhibit 10 to our

21  December 11 hearing.

22          In addition to that, we have also provided the

23  Court with the deposition testimony of Erin English where she

24  was asked who she reports to and who does that person report

25  to and what her job description was and what her duties are.

1   And there was no discussion of her being designated as some

2   sort of special person on a special team who deals with

3   things that need to be limited to specific people.

4          Nothing -- she hasn't described anything that's

5   outside the normal flow chart of things.  And as a matter of

6   fact, we even produced it, as Mr. Moskowitz referenced, a

7   flow chart upon which you'll find Erin English, and that

8   would be doc 146-8.  You will see on there she is, like

9   Mr. Moskowitz said, one member of a team who reports to Keith

10  Krostal, and that's called the data team.

11         Now, I mentioned *Consolidation Coal*.  I think it's

12  very important because it looked at this very issue, and we

13  quoted this in our brief.  In that case there was an engineer

14  who is one of a group of several engineers who was given a

15  piece of evidence from a case, asked to look at it and give

16  an opinion about that to the lawyers.  And the Illinois

17  Supreme Court in that case found that that person, a member

18  of a small group of engineers who was asked directly to

19  comment on something that was directly related to litigation,

20  fell outside the control group and, therefore, it was not

21  privileged.

22         Because what you're talking about here is not what

23  the communication was about, but what we are talking about

24  here is who is the client.  And under Illinois law, the

25  client is top management and the people who advise top

1   management, not Erin English.  So when you are talking to

2   Erin English, you're talking to a third person and,

3   therefore, nothing that you say to her is privileged.

4          THE COURT:  Yes.  Well, I see what you're saying.

5   I mean I think some people are going to be within, some

6   people are going to be within the control group merely

7   because of the stature of their role within a corporation,

8   the senior VPs, et cetera.  Some people are going to be in

9   control groups because they have been specially made parts of

10  some operation, and they are reporting directly to and

11  advising people in those high places.

12         MR. ZIGLER:  And, Your Honor, if it comes down to

13  an issue of whether or not that person is serving some sort

14  of special role where they are the one who is advising the

15  top management and that is someone upon whom top management

16  is relying, what's important and what we point out in our

17  brief in several places, that it is the burden of the party

18  who's seeking to assert the privilege to prove that.

19         And I have two cases that I want to talk about that

20  really illustrate that, and the first one I will direct Your

21  Honor to, one that was cited in our brief, *Claxton versus*

22  *Mayer Manufacturing*, which is 559 N.E.2d 82.

23         That case, it says, first off, that it's the party

24  who claims a privilege that has the burden of showing facts

25  which rise to the privilege.  And that's at page 85.

1          But then the Court goes on and says, specifically,

2     in addition to showing that the claimant must show that the

3     statement originated in confidence; and made to an attorney

4     acting in his legal capacity; and remains confidential, the

5     Court goes on to say, "Beyond this, a corporate claimant must

6     show that the statement was made by someone in the 'corporate

7     control' group."  And this cites the *Consolidation Coal*,

8     where that test that we've already cited.  Okay?

9          THE COURT:  Okay.

10         MR. MOSKOWITZ:  When a proponent cannot prove --

11    when a proponent -- in this case, Allstate -- cannot prove

12    that a statement should be protected, then we can go onto

13    other things.  And they talk about in camera inspection is a

14    reasonable way to deal with it.

15         But then it goes on to talk about in this

16    particular case, they had the proponent submit an affidavit

17    where he talked about what his role was and what he had to

18    do.  And it states, "MacGregor's affidavit does not state

19    facts that show whether he was a member of the Mayer control

20    group.  It does not specify if he had an advisory role in top

21    management, whether a decision interior would normally not be

22    made without his advice, or whether his opinion would in fact

23    form the basis of any decision by others working within the

24    company."  And because of that, the appellate court here

25    found that it was not a member of the control group and the

1    privilege was improperly invoked.  And the circumstances

2    before Your Honor, Allstate has offered nothing, no

3    affidavits, to show that any of these facts exist.

4          Now, if we look at the second case which is

5    important is *Rounds versus Jackson Park Hospital*, another

6    case that we cited, 745 N.E.2d 561, another example where in

7    that case the proponent of the privilege, JPH in this case,

8    presented an affidavit to try and justify his privilege

9    because it bore the burden.  And this was a nurse in this

10   case.

11         The Court goes on.  "In the instant case, JPH has

12   not demonstrated that Nwankwo or the other nurses had

13   advisory roles in top management"... "and that their opinions

14   did in fact form the basis of the final decision by those of

15   actual authority."

16         And here is the important part that goes to whether

17   or not looking at the documents that support.  And here's a

18   quote from this Court.  "The concern is not on what was said,

19   but on who said what."

20         Here, the examples that plaintiffs have cited to

21   you are three specific examples of people who are seven and

22   eight levels down from the top management.  They are clearly

23   not a part of the control group.  It does not matter what the

24   documents say.  All that matters is whether or not these

25   people formed that basis.  And Allstate, even though they

1   bore the burden here, has offered no evidence, zero evidence

2   to satisfy the control group test.  And because of that,

3   plaintiffs' motion should be granted.

4           THE COURT:  Okay.  Thanks.  Let's move onto the

5   second part here, these FTC documents.  This one, I think, we

6   can do pretty simply.  I'm thinking about entering a

7   protective order regarding these, would have been, I think,

8   referred as to the customer records, the non personally

9   identifiable prospective customer records.  That's the one.

10  Keith, is that what you want in the protective order?

11          MR. MOSKOWITZ:  Correct, Your Honor.

12          MR. ZIGLER:  And plaintiffs would agree to allowing

13  these documents covered by the protective order that is in

14  place, but plaintiffs object to the new parameters that

15  Mr. Moskowitz just proposed.

16          THE COURT:  What are the new ones, Keith?

17          MR. MOSKOWITZ:  Your Honor, what we ask for is a

18  limitation on disclosure of these customer records, only to

19  identify the disclosed expert witnesses, and that those

20  expert witnesses agree not to take on work adverse to

21  Allstate for a specified period of time.  The basis for that

22  request, Your Honor, is that it's two-fold.

23          As we detailed in our motion, the customer records,

24  which are basically just the underwriting information for

25  individual policyholders, this really forms the backbone of

1  an insurance company's data base that they use to develop
2  their lading plan, underwriting guidelines and gives them a
3  competitive edge, particularly for a company like Allstate of
4  its size, as an advocate of the record we had.

5       The company's concern is something as sensitive as
6  its entire customer data base is that if the competitive side
7  got ahold of the records, they would gain a competitive
8  advantage.  What we find in these cases that we found in
9  here, even in this case, is that plaintiffs' lawyers often
10  employ actuaries and expert witnesses, consulting and/or
11  testifying, who, as part of their general practice, are not
12  professional expert witnesses.  They actually work with
13  individual insurance companies.  And our concern is to allow
14  these folks, particularly non-disclosed experts, to get ahold
15  of the data base of this size and potentially share that with
16  our competitors.

17       It's a very dangerous position with respect to we
18  also find any number of (inaudible) are very active in state
19  regulatory (inaudible) in prepping for limitations on
20  insurance company business practices, and often those
21  disputes evolve into a question about obtaining support of
22  the theory.  You have analysis.  Have you run data?  Have you
23  proven it up?

24       And, you know, such a large body of data like this
25  is something that could be employed for those purposes.  And

1  so need for the heightened protection is that you reach a

2  factor of these type of cases in the kind of experts.  And we

3  will ask for that additional later, Your Honor.

4          THE COURT:  Well, I don't want to go with that.

5  Here's why.  The additional restrictions that you are asking

6  for are really -- I mean what's going to happen, Keith, when

7  one of these people testifies?  He's going to have to testify

8  about what he's basing his opinion on?  So it's going to kind

9  of come out then.  So --

10          MR. MOSKOWITZ:  We are not objecting to any

11  limitation on the use of the information in this case, and so

12  there's no restriction in the protective order for that

13  witness, for an expert witness to be able to go into court

14  and testify about the information.

15          THE COURT:  Right.  But I mean the information is

16  going to be out.  I suppose there could be other expert

17  witnesses sitting there listening to the testimony, then, who

18  are ready to go out and testify against Allstate.

19          I mean I fully understand and sympathize with

20  Allstate's or anybody's concern about expert witnesses.  They

21  bear watching, but on the other hand, this would be really

22  hard to enforce as to any matter adverse to Allstate.

23          What we'll do is just make these expert witnesses,

24  they will be subject to the protective order.  That means

25  they can't disclose to anybody else, without prior court

1  permission, anything they learn from these documents.  So if,

2  you know, they can't disclose anything, then it's not going

3  to hurt you.

4          MR. ZIGLER:  Your Honor, this is Aaron Zigler,

5  again.  I'm sorry.  The current protective order that's in

6  place has such a provision that says that expert witnesses

7  must execute a confidentiality agreement and not disclose any

8  information learned by the case.  We would agree to treat

9  this information as a trade secret under that protective

10  order, and as a result, have all our expert witnesses execute

11  that agreement, which they have done.

12          THE COURT:  Yes.  As a practical matter, Keith,

13  expert witnesses are not going to violate these protective

14  orders for the simple reason that then they would be

15  poisoning themselves from further testimony.  Then everything

16  they did would be subject to a protective order everywhere

17  they went.  So they're not going to kill that golden egg

18  laying goose, I don't think.

19          So we'll just make them covered by the same

20  protective order and go ahead and produce those documents by,

21  let's see, today is the 4th.  Produce those by the 19th,

22  please, and we will get you out a very prompt ruling on the

23  other part.

24          MR. ZIGLER:  Thank you, Judge.

25          THE COURT:  All right, guys?

1          MR. ZIGLER:  Your Honor, there was also two other

2    submissions, document 156 and 166, and those related to

3    your --

4          THE COURT:  Those are being handled by Judge

5    Reagan, I'm informed.

6          MR. ZIGLER:  All right.  Then.

7          THE COURT:  Okay?  So, Keith, go to the doctor.

8     (Off the record discussion.)

9     (End of telephone hearing.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2

3          I, Jane McCorkle, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Illinois, do hereby certify that the above and foregoing is a

6   true and correct transcript of the proceedings of Telephone

7   Motion Hearing had in this cause as same appears from my

8   stenotype notes made personally during the progress of said

9   proceedings.

10

11

12   DATE:  <u>2/19/10</u>                    s/s Jane McCorkle

13                                    JANE McCORKLE

14

15

16

17

18

19

20

21

22

23

24

25